**PRIMA PRODUCTS, Inc.**
v.
**FEDERAL TRADE COMMISSION.**
No. 79, Docket 22765.

United States Court of Appeals,
Second Circuit.
Argued Nov. 12, 1953.
Decided Jan. 7, 1954.

Milton E. Schattman, New York City, for petitioners.

Alan B. Hobbes, Earl W. Kintner and Robert B. Dawkins, Washington, D. C., for respondent.

Before SWAN, FRANK and MEDINA, Circuit Judges.

MEDINA, Circuit Judge.

The controversy now before us bears a marked resemblance to the proverbial tempest in a teapot. Petitioner Prima Products, Inc. manufactures and distributes to the public a cementitious "waterproofing" paint of excellent quality under the trade name of "Aquella," which has been widely used, apparently with general satisfaction on the part of those who have purchased and used this product. Unfortunately for said petitioner Professor Rudolph Cagey of New York University, writing under the pen name of Kurt Steel, became interested in this product and wrote a rather florid article about it in Forbes Magazine as long ago as December 15, 1945, under the title of "Water, Stay Way From My Wall," and a condensed version was reprinted in Reader's Digest. Petitioner Prima Products, Inc. widely distributed copies of this article as advertising matter. The article was based in large part upon certain tests conducted by the National Bureau of Standards. Although the tests were described in the Bulletin of the Board of Standards and Appeals of

the City of New York, and Professor Cagey had been in touch with the Bureau about the tests, stating frankly that he was about to write something on the subject, the article gave offense to the Bureau as an improper use of confidential information and more particularly because there were other similar products of other manufacturers which were considered equally good if not better by the Bureau. One thing led to another; there were mutual recriminations; new tests of what can at best be considered of a rigorous character were made under exceptionally trying circumstances after the promulgation in 1946 by respondent of certain Trade Practice Rules, hereinafter referred to; and these proceedings, with prolonged hearings and great expense to all concerned, were the result.

In a purely technical sense the Commission is right and we approve the findings as supported by substantial evidence, with the modification hereinafter set forth. But it is difficult to see how the ends of justice would not have been equally served had the Commission given its approval to the stipulation approved by petitioners and by counsel supporting the complaint and the chief of respondent's Trial Division, subject to action by the Commission, which, so far as we can see, accomplished the same result, with certain exceptions which may well have been overlooked by counsel for the respective parties in drafting the stipulation, and which could readily have been provided for in an amended stipulation, save perhaps the references in the advertising to the use of "Aquella" on the Maginot Line, which will be discussed later herein. On the other hand, with a view toward future compliance, the weapon by which the advertising matter of a manufacturer is branded as "false, deceptive and misleading" is a formidable one, and we are not disposed to disturb the exercise of discretion by the Commission in disapproving a stipulation which can do no more than put off the evil day, if not entered into in good faith. While we might differ with the Commission on this subject were we the triers of the fact, there is nothing in this record to show any clear abuse of discretion on this phase of the case.

Strangely enough the nub of the matter seems to be that no known substance will make solid masonry or anything else absolutely impermeable to or proof against the passage of water or moisture. While we are told that the passage of moisture through masonry by capillarity is a well-known scientific fact, the probability is that the general public does not give such a strict and scientific meaning to the words "waterproof" or "watertight." Cf. United States v. Brown & Eadie, 2 Cir., 1905, 136 F. 550. Even the law books abound with uses of the word "waterproof" where the context indicates that there was no thought of the absolute exclusion of water or moisture in the scientific sense of complete impermeability, and it is commonplace to hear references to "waterproof" shoes, boots, clothing and other materials, where no reasonable person would infer that there could be no passage of moisture by capillarity under conditions of prolonged use or unusually severe conditions of external pressure.

At the time of the tests described in Professor Cagey's article, the Trade Practice Rules for the Masonry Waterproofing Industry had not yet been promulgated by respondent. They were adopted on August 31, 1946.

The most important of these new Rules is Rule 2, bearing the title, "Deceptive Use of Representations 'Waterproof,' 'Waterproofing,' etc.," which provides:

(1) In the sale, offering for sale, or distribution of industry products, it is unfair trade practice to use the word "waterproof," "waterproofing," or any other word or representation of similar import, as descriptive of any industry product unless, when properly integrated with or applied to masonry units or masonry structures, the product will render such units and structures impermeable to, or proof against the passage of, water and moisture throughout the life of such units or structures and under all

conditions of water or moisture contact or exposure; * * *

Then follow a long series of specific provisions relative to appropriate qualifications or qualifying terms or descriptions which may properly describe particular products in such a way as to protect the public against any possible misunderstanding of the extent to which these products will serve to exclude water and moisture.

The "Definitions" set forth in the preliminary part of these Trade Practice Rules which appear in the footnote [1] are so precisely drawn as to avoid any possible ambiguity in the use of the words "industry products," "masonry units" and "masonry structures." Cinder blocks are plainly included.

 That it was within the competence of the Federal Trade Commission to promulgate these Rules in the public interest is not challenged. It matters not that persons of average intelligence would scarcely expect cinder blocks "waterproofed" by "Aquella" or any other industry product to be proof against the passage of a certain amount of moisture by capillarity. We cannot say that there may not be some who might expect masonry structures thus "waterproofed" to remain absolutely dry under any and all conditions of water pressure from without. As these Rules are applicable alike to all members of the industry, petitioner must comply with them.

This disposes of paragraphs (4) and (5) of the order complained of, which direct petitioners to cease and desist from representing that the application of "Aquella" to below grade masonry surfaces or structures will render them "impermeable or proof against the passage of water or moisture" or make them "waterproof" or "watertight." These paragraphs will also suffice as they stand to prevent any representation that the Maginot Line was made "waterproof" by the application of "Aquella."

The separate paragraph of the order relative to the Maginot Line is not supported by substantial evidence, when the record is read as a whole, and it must be deleted.

 There is no serious dispute about the fact that "Aquella" was originally a French product and that it was used in the Maginot Line. The affidavits of French officials as to the details of such use and what was accomplished thereby were properly rejected by the Trial Examiner as not competent proof. There is no evidence whatever in the record to show the actual conditions which existed in the Maginot Line, the manner and extent to which "Aquella" was used or the amount of moisture, if any, which appeared on the inner surface of the masonry of the Maginot Line after "Aquella" had been applied. Whether or not, as claimed in some of Petitioner's advertising matter, the French authorities specified "Aquella" for use on the Maginot Line "wherever conditions of seepage prevailed," or used it "to control water seepage and dampness in the Maginot Line when other materials failed," does not appear in the evidence. Nor was this lack of proof to sustain the charge supplied by Cyrus C. Fishburn, who merely testified that

---

1. As used in these rules, the terms "industry products," "masonry unit," and "masonry structure" have the following meanings, respectively:

(a) *Industry products:* Admixtures and coatings which render, purport to render, or are represented as rendering, concrete, brick, stone, stucco, concrete blocks, cinder blocks, mortar, or other masonry, or structures or parts of structures made thereof, impermeable or more resistant to water and moisture or the effects thereof.

(b) *Masonry unit:* A concrete block, cinder block, brick, stone, or other similar structural unit.

(c) *Masonry structure:* Any structure or part of structure which is made of concrete, stucco, or other masonry, or of concrete blocks, cinder blocks, brick, stone, or similar units, bonded by mortar or other material. The term includes building walls, retaining walls, roofs, basements, foundations, floors, dams, reservoirs, tanks, swimming pools, piers, silos, and parts thereof, as well as other structures and parts of structures, which are of any such composition and construction.

"if there was a problem of water seepage in a fortification hundreds of feet below ground, the walls being from 24 to 30 feet in thickness, located under valleys honeycombed with buried springs and water courses, in places built through marshes and swamps" (this being the description of the Maginot Line conditions in Professor Cagey's article), an application of "Aquella" would not make the underground "dampproof" nor prevent "seepage by capillary action" nor "condensation." Despite all this it might still be true that the French authorities had specified "Aquella" for use on the Maginot Line "wherever conditions of seepage prevailed," and had used it "to control water seepage and dampness in the Maginot Line when other materials failed." We may suspect that the description of the fortification given by Professor Cagey was somewhat embellished, but that does not alter the fact that the burden of proof rested on respondent.

The balance of the alleged misrepresentations are of minor consequence. Petitioners advertised that "Aquella" operates on an entirely new principle. This turns out to be the method of scrubbing "Aquella" into the masonry in order to fill each tiny hole and thus make the binding qualities of the product operate effectively. It is not clear whether petitioner Prima Products, Inc. took the lead in using this method. In any event, most similar products appear now to be applied in this fashion. The advertising, however, is open to the construction that the combination of materials in "Aquella" constituted, at least to some extent, the supposed "new principle"; and the fact is otherwise. For example some of the advertising material stated, "Aquella works on an entirely new principle. Mixed with water and scrubbed into the face of the masonry, its finely ground ingredients *penetrate intensely* to fill, close and seal the tiniest pores. Then, because of its chemical properties, an expanding reaction sets up a harder, firmer bond when water contacts it." (Emphasis by petitioner Prima Products, Inc.)

In one of the advertisements the application of "Aquella" is described as "easy," and in the magazine article above referred to it is described as "almost as simple as whitewashing." The directions on the containers in which "Aquella" is sold and the references to such directions in some of the pamphlets and other advertising matter are plain and readily understood by anyone of average, or even less than average intelligence. While it cannot fairly be said that the compliance with the instructions amounts to a procedure "almost as simple as whitewashing," it does seem "easy," at least at first blush. A person of average intelligence would surely have no trouble following the instructions. But they are somewhat elaborate and include a thorough saturation of the wall with clean water, spraying or wetting the surface from all directions (up, down, left, and right) at least four times. After all, "easy" is a relative term and we cannot say that no one would be misled.

Nor is there any merit in the contention that petitioner Prima Products Inc. should be permitted to continue to circulate copies of the magazine article above referred to because the new Rules had not been adopted at the time of publication of the article. If the expressions there used are now open to objection, as we have already found to be the case, further distribution thereof must be stopped. Moretrench Corporation v. Federal Trade Commission, 2 Cir., 1942, 127 F.2d 792, 795.

The other points raised by petitioners require no comment.

As modified, the order is affirmed and will be enforced.